# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| STEPHAN GALBREATH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 17-03152-CV-S-RK-P |
| | ) | |
| CINDY GRIFFITH, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Before the Court is Petitioner Stephan Galbreath's Petition under 28 U.S.C. § 2254 for a writ of habeas corpus. (Doc. 1.) For the reasons below, the Petition is **DENIED**, a certificate of appealability is **DENIED**, and the case is **DISMISSED**.

## Background

The Missouri Court of Appeals stated the facts as follows on direct appeal:

> In 2004, Defendant was the most notorious cocaine dealer in Osage Beach and the surrounding area. Around November of that year, he permitted a dealer who sold cocaine for him, named Robert "Boo" Jones ("Boo"), to front an ounce of cocaine to Michael Young ("Young"). Young agreed to sell the cocaine for Boo and pay him back later, but instead he "wound up doing it all" himself. Boo called Young for a couple of weeks trying to collect the $1,000.00 Young owed him for the cocaine, but Young continued to evade him. Defendant wanted his money, so he ordered Boo to go with him to Young's house "to make an example out of him." Defendant got very angry when Young said he did not have the money and ordered Boo to "do something" about it. Boo hit Young several times in the jaw while Defendant yelled, "Is that all he's going to get? You need to hit him one more time." When Boo finally stopped hitting Young, the men ordered Young to get in the car and told him that he wasn't going to leave their sight until they got their money. They drove him to Boo's house, where Young was not free to leave. Defendant told Young he better call some people and try to get the money. Young called several people, but could not get a hold of anyone because it was so late at night.
>
> Young spent the night at Boo's house, and the next morning recommenced his efforts to raise money by calling several people. He called his ex-girlfriend ("Victim")[1] several times. She kept refusing to help him, telling him she didn't

---

[1] In order to protect the identity of Victim and her family we will refer to her family members only by their first names. [Brackets are used to show where the Court has renumbered footnotes.]

have any money. That afternoon, there were several people over at Boo's house. Defendant took his .38 revolver and fired a shot into the floor near the head of a drug dealer who was sleeping on the floor. The dealer jumped up, thinking that Defendant had shot Young, and saw Defendant standing next to him laughing with the .38 revolver in his hand. Young got very scared, and called Victim again. He told her that he thought Defendant and Boo might be planning on killing him, and whispered to her that he was scared and wanted her to call the police. She offered to get him $400.00. Defendant agreed to let Young go if he gave him the $400.00.

That evening, Defendant, Boo, and Young met Victim at a nearby Wal-Mart parking lot. Victim gave Boo the $400.00 then went inside the store with Young. She told Young that she had called the police and they were waiting all around the parking lot. Young got angry at her for calling the police, because of what Defendant might do to him or Victim for being a "snitch." Defendant always made it known to everyone that snitches would be killed. After leaving the parking lot, Defendant and Boo were pulled over by the police and arrested for kidnapping.[2] Within a few days, both of them had posted bond and were released from jail.

About three weeks later, on the evening of December 28, 2004, Defendant called his girlfriend, Kristina Jones ("Jones"), and told her to come pick him up at his house. Defendant would frequently call Jones and have her pick him up and drive him to Jefferson City, where they would usually hang out with Defendant's friends at a billiards hall named "Mike's Corner Pocket" and sometimes spend the night in a motel. Jones always drove, and Defendant would tell her where to go. Defendant never wanted anything in his name and always made Jones register the motel rooms under her name. He also had her register a cell phone for him under her name.

On the evening of December 28, Jones arrived at Defendant's house around eight-thirty. Defendant and another man came out of the house and approached her car. The second man was dressed all in black, with a hooded sweatshirt drawn tight around his face. Although she had seen him many times before and knew him well, it took Jones a few seconds to recognize the man as Defendant's best friend, Darrell Turner ("Turner"). Defendant and Turner got into Jones' white Acura, and Defendant told her to "[d]rive." When she got to the intersection where they would normally turn right to go to Jefferson City, Defendant told her to turn left toward Osage Beach. She was surprised and asked him where they were going, and he told her, "Don't worry about it." Defendant then told her to turn onto Horseshoe Bend Parkway. Jones was growing uneasy because they had never gone this way before, and Defendant had never had someone in the car dressed so strangely. She asked Defendant again where they were going, and he said, "We are just going to scare somebody . . . no big deal, don't worry about it." Defendant continued ordering Jones where to turn until they finally ended up in a circle drive at the end of Cornett Branch Road. Jones circled around, and Defendant told her to "keep driving." She drove back up Cornett Branch Road the way she had come, and Defendant told her

---

[2] The kidnapping charge, as noted [*supra*] was severed from and not tried in this case.

2

to stop in front of a wooded area. Defendant asked Turner, "Is this good?" and Turner got out of the car. Defendant told Jones to drive, and she continued driving back up Cornett Branch Road.

Defendant directed Jones to a nearby convenience store named LaFatta's, where he went inside and bought a drink. Jones kept asking Defendant what was going on, and he kept telling her not to worry about it. Defendant then directed Jones to an apartment building back in the area near Cornett Branch Road, and had her pull into a parking space and stop. Defendant was speaking calmly with someone on his cell phone, asking, "What's going on? What can you see? How are you doing? How's everything going?" After sitting in the parking lot for awhile, Defendant said, "Let's go," and Jones drove.

Defendant directed Jones to drive back toward Cornett Branch Road. On the way, he told her he wanted her to go knock on a door and ask for "Tammy Franklin." Jones had never before heard that name and did not know anyone by that name. She knew she had to do what Defendant wanted, because she was too afraid of what he would do to her if she said no. Defendant directed Jones to a house on Cornett Branch Road, right before the wooded area where they had dropped off Turner. The house was Victim's, although Jones had no idea whose house it was, or who Victim was. Jones pulled into the driveway in front of the garage, next to three other cars that were parked in the driveway. She got out of the car, and Defendant got into the back seat. Jones knocked on the front door, and Victim's brother, Marcus, answered the door. Jones asked Marcus if "Tammy Franklin" was there, and he said he had no idea who she was talking about. Then Victim came to the door, and Jones also asked her if "Tammy Franklin" was there. Victim said, "No, you might want to try the next house down." As Jones was walking away, Victim's cat ran out the door, and Marcus chased it down. He noticed Jones' white, two-door car in the driveway, which he thought was either an Acura or a Honda. Marcus took the cat back inside and Jones got back into her car.

Defendant asked Jones, "Well?" She replied that they told her Tammy wasn't there. Defendant asked, "Was she bigger?" Jones asked, "The girl?" Defendant said, "Yes, was she bigger?" Jones replied, "Yes." Defendant said, "All right, let's go," and he directed her back to LaFatta's. He had Jones park in a small parking lot along the side of LaFatta's, where he made a call on his cell phone. Jones heard him say, "What's going on? Where are you at? What can you see?" He then told Jones to "just drive," and she drove to a nearby mini-mart where she used the bathroom. Jones again asked Defendant what was going on, and he told her not to worry about it.

Defendant then ordered Jones to drive back toward Cornett Branch Road. Defendant was attempting to make phone calls along the way, and by the time they arrived at the wooded area where Turner had gotten out of the car, Defendant was "freaking out" because he couldn't get a hold of whomever he was trying to call.

On December 28, 2004, Victim was hanging out at home with her brother Marcus and her niece and nephew, Rachel and Daniel, when Jones knocked on her door. Shortly after Jones left, Marcus left to go buy some cigarettes at LaFatta's.

3

As he was driving up Cornett Branch Road toward LaFatta's, he saw the white Acura or Honda that he had seen earlier in the driveway pass by him heading the opposite direction. Not long after Marcus left the house, Daniel decided to leave, and Victim walked him to the door. When Daniel opened the front door, he saw a man standing in front of him pointing a gun at him—a black revolver—about a foot from his face. The man was wearing a dark hooded sweatshirt pulled tight around his face. The man instructed Daniel to lie on the ground, and he obeyed. Victim was standing behind Daniel when she saw the man at the door pointing a gun at Daniel's face. She said to him, "What do you want? Do you want money?" The man asked, "Are you [Victim]?" She replied, "No, I'm her sister." Victim thought the man was there to kill her because she had called the police on Defendant and Boo, and she thought she might be able to trick the man into thinking she was someone else. The man told her to "[g]et on the floor" and asked if there were any other people there. Victim told him Rachel was in the kitchen, but did not get on the floor right away in an attempt to stall him. Rachel came out into the entrance where the man could see her, and he instructed her and Daniel to lie down on the floor in the kitchen. He then ordered Victim to get on the floor in the kitchen doorway, and she did.

Next the man called someone on his cell phone. He said into the phone, "I don't know if it's her." He then asked the person on the other end to "[d]escribe [Victim]" and "asked if she was a bigger girl." Then he said, "Yeah, it's her." He told the person, "There's kids here," and the person on the other end said, "Kill them all." The man hung up the phone and yelled at Victim, "Are you trying to play me? Are you trying to play me?" Daniel then heard two gunshots. About thirty seconds later, he and Rachel ran into the garage, and Daniel called 9–1–1 from his cell phone. The next thing Victim remembered was waking up in the hospital on January 21, 2005.

Meanwhile, while Defendant was "freaking out" in the car, Jones had circled around the drive, and they were sitting in front of the wooded area, headed back up Cornett Branch Road. About thirty seconds later, Defendant connected with the person he was trying to call. Jones heard Defendant say, "You're in, you're in," and then, "Her name is [Victim] and she is kind of bigger." Then he said, "There's kids in there," and told the person to kill them all. Defendant's window was down just a little bit, and Jones heard a gunshot. Defendant yelled, "Go!" and Jones sped up the road. As they passed Victim's house, Turner came running out of the house still dressed all in black with the hooded sweatshirt pulled tight around his face. Defendant yelled to Jones, "Stop!" and Turner got into the car. Both Defendant and Turner yelled at her, "Go!" and then Defendant looked at his cell phone and said, "11:06, I need to be made public."

As Jones sped away, Defendant asked Turner what had happened in Victim's house. Turner said, "Two shots to the head, she's dead." Turner told him there were kids in the house and that he had put them in a room across from the refrigerator. Defendant wanted to know if the kids had seen anything, and Turner replied, "No, everything is fine. This isn't anything to me, this is like nothing new to me." The two then discussed whether to return to Defendant's house in Osage

Beach or to go to Jefferson City, and Defendant directed Jones to drive to Jefferson City. As Jones drove on highway 54 toward Jefferson City, both Defendant and Turner yelled at her for speeding. They also discussed what they were going to do with the gun.

Defendant directed Jones to drive to a duplex in a residential neighborhood. Turner went inside the duplex and came back out wearing jeans and a t-shirt; his black clothing was gone. Defendant then directed Jones to drive them to Mike's Corner Pocket. He told her to park by the back entrance along the alleyway. Defendant and Turner had decided to put the gun in the dumpster behind "Hollywood," which was next to Mike's Corner Pocket.[3] Defendant and Jones got out of the car, while Turner was in the back seat "doing something with a plastic bag and newspapers[.]" Then Defendant and Jones went inside Mike's Corner Pocket and Turner walked down the alleyway. Defendant got some balls and played pool by himself in the middle of the bar, which was more visible than his usual table. Eventually Turner came inside and joined them. Defendant made a phone call, then handed Jones his pool cue and said, "I'll be right back, don't go anywhere." He and Turner left out the front door, and Defendant returned about ten minutes later. When the bar called "last call" twenty minutes later, Defendant said, "We're going," and Jones followed him up to the bar. Defendant told the bartender "he had a little bit of trouble at the lake" and needed a receipt for his pool time. It was not normal practice at the bar to give out receipts, so the bartender handwrote one on a piece of paper. Defendant paid for four hours of pool time, even though he had only been there for about an hour.

Thereafter, Defendant and Jones went to a hotel. Defendant handed Jones some cash and told her to go inside and get a room. While Jones was inside registering the room in her name like usual, Defendant came in and said, "We have to change it. The room has to be in my name." Defendant signed a new registration form, then he and Jones went to the room. Throughout most of the night, Defendant sat in a chair making calls on his cell phone. The next morning, Jones drove them back to Osage Beach and dropped Defendant off at his house. As he was getting out of the car, Defendant handed Jones the cell phone which he had made her take out in her name, and said, "You've had this for a few days." Jones looked at him strangely, and he said, "Yes." Jones did not see Defendant again after that.

Victim suffered a gunshot wound to the left side of her head in the temporal area—just above her hairline. There was black powder burn around the gunshot wound, indicating that she had been shot at close range. The bullet had traveled through her left and right frontal lobes and remained behind her right eye. The frontal lobes control abstract thought, emotions, and speech. Victim has a permanent speech defect, and the bullet remains in her head, because it would be too dangerous to remove. Dr. Brent Miedema, the trauma surgeon who treated

---

[3] The dumpsters behind Mike's Corner Pocket and Hollywood are emptied daily. Although investigators searched every dumpster in the alleyway, they were not able to find the gun.

5

Victim, stated that in his twenty-two years of experience as a trauma surgeon, he had never seen a gunshot wound like Victim's not result in a fatality.

Detectives investigating Victim's shooting recovered a bullet from underneath Victim's house after noticing a small hole in a pool of blood on the kitchen floor. They also recovered a bullet from underneath Boo's trailer home. The Missouri Highway Patrol crime lab examined the bullets and determined that everything between the two bullets was consistent, and there were no dissimilarities, indicating that both bullets could have been fired from the same gun.

*State v. Galbreath*, 244 S.W.3d 239, 241-47 (Mo. App. 2008).

Petitioner was charged with kidnapping Young and, regarding Victim, with acting as Turner's accomplice in committing first-degree assault, first-degree burglary, unlawful use of a weapon, and armed criminal action. The kidnapping charge was severed prior to trial and later dropped. At trial, the jury found Petitioner guilty on all four counts regarding Victim, and he was sentenced to life imprisonment plus 235 years. The Missouri Court of Appeals affirmed on direct appeal, *id.*, and again on appeal from the denial of postconviction relief, *Galbreath v. State*, 500 S.W.3d 867 (Mo. App. 2016). Petitioner then filed this Petition under § 2254.

## Discussion

The Petition is barred by the applicable one-year statute of limitations. 28 U.S.C. § 2244(d)(1). Although delving deeper is unnecessary, the Court has reviewed each of Petitioner's eleven claims and concludes that they would all fail, either because they are procedurally defaulted or because they lack merit.

**I.  Statute of Limitations**

The limitations period in this case commenced when "the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). It tolled while "properly filed" state postconviction proceedings were pending. *Id.* § 2244(d)(2).

Here, there is no dispute that the judgment became final on February 15, 2008. There is also no dispute that 298 days elapsed between the end of the state postconviction proceedings (August 10, 2016) and the filing of this case (June 4, 2017). (Doc. 11 at 4; Doc. 20 at 3.) At issue is the length of time between the finality of the judgment (February 15, 2008), and the date the postconviction motion was "properly filed."

Petitioner argues that his postconviction motion was "properly filed" under the "prison mailbox rule" either on the date he signed the motion (April 17, 2008) or the date of his

accompanying cover letter (April 21, 2008). (*See* Doc. 11-10 at 12, 17.) This would add either 62 or 66 days to the clock for a total of 360 or 364 days. The State argues that the prison mailbox rule does not apply in Missouri and that the "properly filed" date was when the clerk of the state court received the motion (May 1, 2008). (Doc. 11-10 at 12; Doc. 11-16 at 8.) This would add 76 days to the 298 and render the Petition out of time.

The State is correct. A postconviction motion is "'filed' . . . when it is delivered to, and accepted by, the appropriate court officer for placement into the official record." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). A postconviction motion is "'*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Id.* In Missouri, a postconviction motion "is deemed filed at the time it is received by the clerk of a circuit court." *Vogl v. State*, 437 S.W.3d 218, 225 (Mo. banc 2014). The prison mailbox rule does not apply. *Baird v. State*, 512 S.W.3d 867, 869 (Mo. App. 2017) ("[T]he only relevant inquiry under Missouri law is when the post-conviction motion was filed with the clerk of the circuit court, not when it was mailed. . . . unless and until our Supreme Court instructs us otherwise.") (cleaned up).

Accordingly, the Petition must be dismissed as untimely. Even if the Petition were timely, however, the Court would deny it for the reasons below.

## II. Ineffective Assistance for Failure to Raise Insufficiency of the Evidence (Ground 1)

Petitioner argues that his trial and direct appeal counsel were ineffective because they did not argue there was insufficient evidence to find that he "acted together with" Turner. This claim is procedurally defaulted because it was not raised in the postconviction motion or on postconviction appeal. (Doc. 11-10 at 62-107; Doc. 11-11.) *See Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994) ("Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review.").

Petitioner seeks to excuse the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012), by arguing that his postconviction counsel[4] was ineffective for not raising this claim. However, *Martinez* does not apply to the part of this claim that argues direct appeal counsel was ineffective. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017).

As for the trial counsel component of the claim, it does not rise to the level of a "substantial" ineffectiveness claim that can be resurrected under *Martinez*. To excuse a procedural default under *Martinez*, the underlying ineffective-assistance-of-trial-counsel claim must be

---

[4] Petitioner's postconviction counsel was the same at the motion court and appellate level.

7

"substantial," and postconviction counsel must have been constitutionally ineffective with respect to the claim. 566 U.S. at 14. A claim is "substantial" if it has "some merit" and "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 14-16.

Here, the underlying ineffectiveness claim is not substantial. Under both Missouri law and the requirements of due process, evidence is sufficient to convict if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Zetina-Torres*, 482 S.W.3d 801, 809 (Mo. banc 2016). "Any evidence that shows affirmative participation in aiding the principal to commit the crime is sufficient to support a conviction." *Zetina-Torres*, 482 S.W.3d at 809 (cleaned up). "Moreover, all persons who act together with a common intent and purpose in the commission of a crime are equally guilty." *Id.* (cleaned up).

Petitioner claims his trial counsel should have argued there was insufficient evidence to show he "acted together with" Turner. This claim fails for two reasons. First, regardless of whether Petitioner "acted together with" Turner, there was overwhelming record evidence to support a finding that Petitioner affirmatively participated in aiding Turner. *Zetina-Torres*, 482 S.W.3d at 809. Specifically, the record details evidence that Petitioner supplied Turner with the revolver used to shoot Victim; directed and delivered Turner to Victim's residence; explained to Turner what Victim looked like; instructed Turner to kill everyone in the residence; directed Jones to position the car to pick up Turner; yelled at Jones to "Go!" once Turner was in the car; and sought to cover their actions by being "made public."

Second, Petitioner is incorrect that there was insufficient evidence to find that he "acted together with" Turner. Petitioner claims this phrase has a special meaning under Missouri law— that he must have committed a "conduct element" of the offense. Essentially, he argues there was insufficient evidence that he "acted together with" Turner because there was no evidence that he broke into the home with Turner, brandished the firearm, or shot Victim. However, the Missouri Court of Appeals rejected this argument on direct appeal under Missouri law. In addressing a corresponding instructional error claim, the Missouri Court of Appeals held that "a juror could reasonably conclude that [Petitioner] 'acted together with' Turner in committing the offenses" because, under Missouri law, "[t]he proximity of [Petitioner's] conduct to Turner's commission of the offenses was so close that [Petitioner's] conduct could accurately be described as essential to

the completion of the crimes." *State v. Galbreath*, 244 S.W.3d at 254. A rational trier of fact could have reached this conclusion based on the evidence recited above.

Trial counsel was not deficient under *Strickland* for not raising a meritless insufficiency argument, so this is not a "substantial" *Martinez* claim. For the same reason, postconviction counsel could not have been ineffective for not raising this claim. Therefore, Ground 1 remains procedurally defaulted.

### III. Ineffective Assistance for Failure to Object to Verdict Directors (Ground 2)

Petitioner argues that trial counsel was ineffective for failing to object to the verdict directors, which the parties do not dispute failed to comply with Note on Use 5 to Missouri Approved Instruction § 304.04 (MAI). Under Note on Use 5, when a verdict director ascribes all "conduct elements" to someone other than the defendant in an accomplice liability case, the verdict director must describe the defendant's conduct by using the phrase "aided or encouraged." (Doc. 11-6 at 68.) Here, the verdict directors ascribed all "conduct elements" to Turner but used the phrase "acted together with or aided" instead of "aided or encouraged." (*Id.* at 60-63.) Trial counsel did not object. On direct appeal, the Missouri Court of Appeals reviewed for plain error and affirmed, despite acknowledging the instructional error, because there was no "manifest injustice" (a heightened prejudice analysis). *State v. Galbreath*, 244 S.W.3d at 248-54.

Petitioner now claims trial counsel was ineffective for failing to object to the erroneous instruction. This claim is procedurally defaulted because he did not raise it in his postconviction motion or on postconviction appeal. (Doc. 11-10 at 62-107; Doc. 11-11.) *Jolly*, 28 F.3d at 53. Petitioner seeks to invoke *Martinez* to excuse the procedural default, but this claim is not "substantial" under *Martinez* because it fails on the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984). There is not a reasonable probability that correcting the instructions would have produced a different result at trial. The correct verdict director would have instructed the jury to find guilt if Petitioner "aided or encouraged" Turner, and the overwhelming weight of the evidence discussed above shows that he did. This would not have had more than an "isolated, trivial effect." *Strickland*, 466 U.S. at 696.

Accordingly, the underlying ineffectiveness claim is not substantial under *Martinez*, and postconviction counsel could not have been ineffective for not raising it. Therefore, Ground 2 remains procedurally defaulted.

9

**IV. Ineffective Assistance of Postconviction Counsel (Ground 3)**

Ground 3 appears to allege a freestanding claim[5] of ineffective assistance of postconviction counsel for failing to raise the claim in Ground 2. This claim fails because § 2254(i) bars freestanding claims of ineffective assistance of postconviction counsel, and there is no constitutional right to effective assistance of postconviction counsel, *Barnett v. Roper*, 904 F.3d 623, 629 (8th Cir. 2018). Therefore, Ground 3 fails on the merits.

**V. Instructional Error (Grounds 4, 5, and 6)**

These grounds allege that the verdict directors' use of the disjunctive phrase "acted together with or aided" violated Petitioner's rights to a unanimous verdict and due process. These claims are procedurally defaulted because Petitioner's trial counsel did not object to the instructions at trial. (Doc. 11-5 at 100); *Fann v. Bowersox*, 247 F.3d 841, 843 (8th Cir. 2001) (procedural default for failing to object to instructions). Although the state court conducted plain error review on direct appeal, "a federal habeas court cannot reach an otherwise unpreserved and procedurally defaulted claim merely because a reviewing state court analyzed that claim for plain error." *Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015). *Martinez* applies only to ineffective-assistance-of-trial-counsel claims, not standalone instructional error claims, and Petitioner does not assert any other "cause" or a gateway claim of actual innocence to excuse the procedural default. *See Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011). Therefore, these grounds remain procedurally defaulted.

The Court will also briefly address the merits of Petitioner's claims that the instructions violated unanimity and due process requirements.[6] Regarding the unanimity claim, the Supreme Court has held that the federal Constitution does not require a unanimous verdict in state court. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 766 n.14 (2010) (explaining *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972)). Accordingly, lack of unanimity is a state law claim that is not cognizable in a federal habeas petition. Section 2254(a)

---

[5] A "freestanding claim" in this context means there is no related and substantial ineffective assistance of trial counsel conduct.

[6] Because the parties did not address which merits standard would apply, the Court assessed these claims under both a *de novo* standard and the *Harrington v. Richter* standard, which asks whether there was a reasonable basis for the state court's judgment. 562 U.S. 86, 102 (2011); *Johnson v. Williams*, 568 U.S. 289, 293 (2013) (rebuttable presumption that *Harrington* applies). Petitioner's claims would fail either way.

(stating that relief may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States"). Similarly, because the Supreme Court previously rejected a federal unanimity requirement in state court, there was no "clearly established" Supreme Court precedent that the state court could have violated on the unanimity issue. Section 2254(d)(1).

As to the due process claim, the errors in the verdict directors do not rise to the level of a due process violation. There is not a "reasonable likelihood" that the errors led the jury to an unconstitutional result. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). As discussed above, correcting the verdict directors would have had no more than an isolated, trivial effect because there was overwhelming evidence that Petitioner "aided or encouraged" Turner. Therefore, even if the Court were to reach the merits, the Court would deny Grounds 4, 5, and 6.

## VI. Ineffective Assistance for Failure to Ensure a Unanimous Verdict (Ground 7)

Ground 7 alleges as follows: "Petitioner was denied equal protection of the law when trial counsel failed to object to the jury instructions, appellate counsel failed to raise the issue on appeal, and PCR counsel failed to raise the issue in Petitioner's 29.15 proceeding in that the jury instructions did not require the jury to reach a unanimous verdict as required by *State v. Celis-Garcia*[, 344 S.W.3d 150 (Mo. banc 2011)]." (Doc. 1 at 22-23.)

The single, unexplained reference to equal protection is insufficient to plead a separate claim under Rule 2(c) of the Federal Rules Governing § 2254 Proceedings. *See Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) ("[A] petitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified," and the "facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.").

The freestanding argument that postconviction counsel was ineffective fails on the merits for the same reasons as Ground 3: § 2254(i) bars freestanding claims of ineffective assistance of postconviction counsel, and there is no constitutional right to effective assistance of postconviction counsel, *Barnett*, 904 F.3d at 629. Accordingly, this part of Ground 7 fails on the merits.

What remains of Ground 7 are procedurally defaulted ineffective-assistance-of-counsel claims. Petitioner did not raise these claims in his postconviction motion or on postconviction appeal, so they are procedurally defaulted. (Doc. 11-10 at 62-107; Doc. 11-11.) *Jolly*, 28 F.3d at 53. Petitioner seeks to excuse the default under *Martinez*, but *Martinez* does not apply to excuse

11

the default for his claim that direct-appeal counsel was ineffective. *Davila*, 137 S. Ct. at 2065.

That leaves only the *Martinez* argument that postconviction counsel should have raised an ineffective-assistance-of-trial-counsel claim based on state law unanimous verdict requirements. This claim is not a substantial one under *Martinez*. Under *Celis-Garcia*, in a "multiple acts" case, the jury instructions must "describe the separate criminal acts with specificity" and "instruct the jury to agree unanimously on at least one of the specific criminal acts described in the verdict director." 344 S.W.3d at 158; *see also Hoeber v. State*, 488 S.W.3d 648 (Mo. banc 2016) (sustaining an ineffectiveness claim based on *Celis-Garcia*).

This is not a "multiple acts" case subject to *Celis-Garcia* and *Hoeber*. "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Celis-Garcia*, 344 S.W.3d at 155-56. "To determine if a case is a multiple acts case, courts consider the following factors: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Id.* at 155 (quotation marks and citation omitted). For example, *Celis-Garcia* and *Hoeber* were multiple-acts cases. In both cases, the jury was instructed that it could find guilt on a single count if it found that statutory sodomy occurred within a broad span of time encompassing several possible incidents that occurred on different days in different locations. However, the jury was not instructed to unanimously agree on any single occurrence.

In contrast, Petitioner was not convicted of committing multiple, distinct criminal acts in a single count. Petitioner's only acts were as an accomplice to Turner burglarizing the home, brandishing a firearm, and shooting Victim, all of which occurred over a continuous stretch of time in the same location. Petitioner was charged in separate counts as an accomplice to each offense, and the State did not present evidence of multiple, distinct criminal acts within any single count. The jury was instructed to consider each count separately and to render a unanimous verdict. (Doc. 11-8 at 53-54.) As a result, the verdict could not have been fractionated as in *Celis-Garcia* and *Hoeber*.

Petitioner argues that "acting together with" Turner and "aiding" Turner were distinct criminal acts that should not have been submitted together in the same verdict director because "acted together with" has a specific meaning: committing a "conduct element" of the offense.

12

However, the instructions did not define "acted together with" in this way or instruct the jury that it meant anything different from "aiding." Under these circumstances, "an ordinary juror would see no distinction between the two terms and would treat them as functionally equivalent." *State v. Young*, 369 S.W.3d 52, 58 (Mo. App. 2012). Trial counsel was not deficient for not raising a meritless claim based on *Celis-Garcia*.

Therefore, the underlying ineffectiveness claim is not substantial under *Martinez*, and postconviction counsel could not have been ineffective for not raising it. Ground 7 fails on the merits in part and is procedurally defaulted in part.

## VII. Ineffective Assistance of Postconviction Counsel (Ground 8)

Ground 8 alleges another freestanding claim of ineffective assistance of postconviction counsel. Specifically, Petitioner claims that postconviction counsel should have pressed the state courts for a ruling on the 13 claims in his pro se postconviction motion. This ground fails on the merits for the same reasons as Ground 3: § 2254(i) bars freestanding claims of ineffective assistance of postconviction counsel, and there is no constitutional right to effective assistance of postconviction counsel, *Barnett*, 904 F.3d at 629. Furthermore, even if Ground 8 could be construed as incorporating the 13 pro se claims by reference, this is insufficient to plead a habeas claim under Rule 2(c) of the Federal Rules Governing § 2254 Proceedings. The Court will not sift through the briefs filed in state court "to divine the grounds or facts which allegedly warrant relief." *Adams*, 897 F.2d at 333; *see also Frey v. Schuetzle*, 78 F.3d 359, 361 (8th Cir. 1996) (higher expectations for petitions filed by counsel). Therefore, Ground 8 fails on the merits.

## VII. Ineffective Assistance: Drug-Dealing and Kidnapping Evidence (Grounds 9 and 10)

Grounds 9 and 10 allege that trial counsel was ineffective for not objecting to, and eliciting during cross-examination, testimony relating to Petitioner's drug dealing and the kidnapping of Young. These claims are preserved for review under § 2254.[7]

On the merits, the Court analyzes whether the last state-court decision that provides a relevant rationale (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State

---

[7] The Petition also states that "[t]rial counsel failed to properly object to the prosecutor's opening statements" about the kidnapping, but again, this passing comment is insufficient to plead a separate claim under Rule 2(c) of the Federal Rules Governing § 2254 Proceedings. *See Adams*, 897 F.2d at 333-34.

court proceeding." 28 U.S.C. § 2254(d); *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Following a hearing, the motion court rejected Petitioner's claims, and the Missouri Court of Appeals affirmed under *Strickland*'s deficiency prong. *Galbreath v. State*, 500 S.W.3d at 869. The state court concluded that an objection to the drug-dealing and kidnapping evidence would have been meritless because it "establish[ed] [Petitioner's] motive and [wa]s so intertwined with the evidence of the burglary and attempted murder that to exclude it would have deprived the jury of evidence needed to paint a complete and coherent picture of the crimes presented to them." *Id.*

This conclusion was reasonable. Missouri trial judges have "wide discretion over issues of relevancy and admissibility," including whether the probative value of evidence outweighs unfair prejudice. *State v. Prince*, 534 S.W.3d 813, 818 (Mo. banc 2017). The Court believes reasonable jurists could disagree about the merits of Petitioner's proposed relevance objections, and "a state-court decision is not unreasonable if fairminded jurists could disagree on its correctness." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (cleaned up).

Petitioner argues that counsel was deficient, and the state court's decision was unreasonable, because even if some evidence of drug-dealing and kidnapping was relevant to motive, counsel should have tried to limit the extent and detail of this evidence from coming in at trial. During the postconviction hearing, however, trial counsel testified that he had legitimate strategic reasons for not doing so. Specifically, he testified that the judge had already decided prior to trial that this evidence was relevant to motive, and counsel believed that it would help to claim Petitioner was "actually fairly gentle with [Young]" and not "the big bad thug" the prosecution tried to paint him as. (Doc. 11-14, PCR Hearing Tr. at 11-12, 16, 18-20, 49-52, 56-57.) Trial counsel also testified that he considered at trial whether the prosecutor was taking it too far; that he made some objections but not all possible ones; that he believed some of drug-dealing and kidnapping evidence was helpful to the defense; and that he believed contesting his client's drug-dealer status would have hurt his credibility with the jury. (*Id.* at 20, 57-58, 63-67.) This is consistent with the parts of the trial record referenced in Grounds 9 and 10 of the Petition. It also aligns with counsel's trial theory that the police pressured Kristina Jones to frame Petitioner so they could catch a "big fish" drug dealer. (Trial Tr. at 163-64, 168, 172-73, 306-07.)

Although other competent lawyers might have tried to exclude different parts of this evidence, assessed its overall impact differently, or attempted to minimize it in different ways, trial counsel's decisions were competent judgment calls. "Even the best criminal defense attorneys

14

would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Therefore, it was reasonable for the state court to conclude that trial counsel was not deficient. *Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (quotation marks and citations omitted). Grounds 9 and 10 fail on the merits.

**VIII. Ineffective Assistance for Failure to Impeach Kristina Jones (Ground 11)**

Ground 11 asserts that trial counsel was ineffective for failing to impeach Kristina Jones with her deposition and preliminary hearing testimony. Petitioner raised this claim in his postconviction motion but not on postconviction appeal. (Doc. 11-10 at 84-85; Doc. 11-11.) *Martinez* cannot be used to excuse ineffective assistance of postconviction appellate counsel. *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012). However, it is unclear whether this claim was defaulted prior to judgment or during the appeal in the postconviction proceedings,[8] so the Court will analyze it under *Martinez*.

The Court first notes that this claim is not adequately pled. Petitioner does not say what prior inconsistent statements should have been used to impeach Ms. Jones. He argues broadly that "[i]t was clear there were significant differences in her [testimony] . . . regarding descriptions of the firearms used and details surrounding the incident at [Victim's] home and those discrepancies would have had a significant impact upon [her] trial testimony and the credibility to be assigned to her by the jury." (Doc. 1 at 36-37.) This is not specific enough to plead an ineffectiveness claim. "On the competence prong, an inmate must allege specific acts of incompetence." *Hernesto v. Denney*, No. 14-764-CV-W-GAF-P, 2015 WL 163522, at *4 (W.D. Mo. Jan. 13, 2015); *see also Parton v. Wyrick*, 614 F.2d 154, 158 (8th Cir. 1980). Furthermore, neither § 2254 nor the Federal Rules Governing § 2254 cases "require the federal courts to review the entire state court record of habeas corpus petitioners to ascertain whether facts exist which support relief." *Adams*, 897 F.2d at 333. "Requiring such an exhaustive factual review of entire state court records would pose an insuperable burden on already strained judicial resources." *Id.*

Regardless, certain portions of Ms. Jones's testimony show that Ground 11 is not a

---

[8] The motion court did not address this claim. Postconviction counsel raised it in the motion and during the hearing, but her proposed findings of fact and conclusions of law stated it was unproved. This document is not in the Court's file but is judicially noticeable through Missouri Case.net at *Galbreath v. State*, No. 08LA-CC00034, at *18 ¶ 7 (filed Dec. 2, 2013 Cir. Ct. Laclede Cnty., Mo.). Whether the default occurred because of postconviction counsel's proposed order or her appellate brief is unclear and unbriefed.

substantial claim under *Martinez* because it fails under *Strickland*'s deficiency prong. Ms. Jones testified consistently that she never saw Petitioner with a black gun, only two silver ones, and that she never saw the gun Turner used. (Trial Tr. at 598; Preliminary Hearing Tr., Doc. 2-4 at 193-94, 229, 265, 277, 279, 284, 295-96; Deposition Tr., Doc. 2-5 at 61, 86-87, 99-100.) Rather than belabor this, trial counsel attempted to discredit Ms. Jones in other ways—by emphasizing that she lied to the police at first, pointing out that she lied during the preliminary hearing about her drug use, suggesting she had incentive to lie for the prosecution because she could be charged with drug trafficking, and insinuating that the police coached her during interrogation. (*E.g.*, Trial Tr. at 528-30, 543-44, 547, 556-57; Doc. 11-14, PCR Tr. at 25.) These were competent judgment calls by trial counsel.

Accordingly, the underlying ineffectiveness claim is not substantial under *Martinez*, and postconviction counsel could not have been ineffective for not raising it. Therefore, Ground 11 remains procedurally defaulted.

## IX. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court may issue a certificate of appealability only where a petitioner "has made a substantial showing of the denial of a constitutional right." This requires showing that "reasonable jurists" could find the Court's decision to be "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quotation marks and citations omitted). For the reasons above, Petitioner has not met this standard.

## Conclusion

Accordingly, the Petition is **DENIED**, a certificate appealability is **DENIED**, and this case is **DISMISSED**.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
DATED: April 8, 2019　　　　　　　　　　UNITED STATES DISTRICT COURT